UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PACIFIC DAWN, LLC, et al.,

                Plaintiffs,

        v.

PENNY PRITZKER, et al.,

                Defendants,

        and

MIDWATER TRAWLERS, et al.,

             Intervenor-Defendants.

NO. C13-1419 TEH

ORDER GRANTING DEFENDANTS'
AND INTERVENOR-DEFENDANTS'
CROSS-MOTIONS FOR SUMMARY
JUDGMENT

      This matter came before the Court on November 4, 2013, on the parties' motion and cross-motions for summary judgment. After carefully considering the parties' written and oral arguments, the Court now GRANTS Defendants' and Intervenor-Defendants' cross-motions and DENIES Plaintiffs' motion for the reasons discussed below.

## I.  INTRODUCTION

      This case is a follow-on challenge by members of the fishing industry to a federal regulation that allocated fishing rights for Pacific whiting off the coasts of Washington, Oregon, and California. On January 1, 2011, the National Marine Fisheries Service ("NMFS")[1], implemented a long-planned individual fishing quota ("IFQ") system whereby

---

[1] The Secretary of the United States Department of Commerce ("Secretary") oversees the National Oceanic and Atmospheric Administration ("NOAA"), which includes NMFS among its member agencies. Secretary Penny Pritzker is substituted for Defendant Rebecca Blank pursuant to Federal Rule of Civil Procedure 25(d). The Secretary, NOAA, and NMFS (collectively, the "Federal Defendants") regulate fishing in the Pacific Coast Groundfish Fishery.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  sectors of the Pacific groundfish fishery received permits to harvest or process specific

2  portions of the fishery's total allowable catch of Pacific whiting.  NMFS, in determining

3  the allocation of IFQ was required to consider various factors enumerated in the

4  Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C.

5  § 1801 *et seq*.  In 2011, NMFS originally allocated IFQ for Pacific whiting to permit

6  holders based on fishing history associated with those permits: for harvesters, the

7  qualifying period of fishing history was 1994-2003 and for shore-based processors, 1998-

8  2004 (the "Original IFQ Allocation").  Plaintiffs Pacific Dawn LLC, Chellissa LLC, Ocean

9  Gold Seafoods, Inc., and Jessie's Ilwaco Fish Company ("Plaintiffs") are harvesters and

10  shore-based processors who contend that NMFS failed to properly consider and credit

11  more recent fishing history in its initial allocation of IFQ.  Many of the same Plaintiffs

12  previously challenged the Original IFQ Allocation in *Pacific Dawn, Inc., LLC v. Bryson*

13  ("*Pacific Dawn I*"), No. C10-4829 TEH, 2011 WL 6748501 (N.D. Cal. Dec. 22, 2011).  As

14  a result of that challenge, this Court held that NMFS acted in an arbitrary and capricious

15  manner in setting the Original IFQ Allocation.  The Court remanded the regulations to

16  NMFS for reconsideration.

17      After a year-long reconsideration process, wherein NMFS examined alternatives

18  that considered more recent fishing history, NMFS decided in 2013 to retain the Original

19  IFQ Allocation and qualifying periods.  Plaintiffs now challenge the NMFS's retention of

20  these same qualifying periods in its new IFQ allocation (the "2013 IFQ Allocation") under

21  the MSA and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706.  For the

22  reasons discussed below, upon review of the parties' arguments and the voluminous

23  administrative record in this case, the Court concludes that NMFS complied with the MSA

24  and APA in issuing the final rule implementing the 2013 IFQ Allocation.  Accordingly, the

25  Federal Defendants and Intervenor-Defendants[2] are entitled to summary judgment on all

27  [2] Intervenor-Defendants Midwater Trawlers Cooperative, Trident Seafoods Corporation,
28  Dulcich, Inc. d/b/a Pacific Seafood Group, Arctic Storm Management Group, LLC, are
    harvesters and shore-based processors who participate in the whiting fishery.  Along with

2

1   causes of action.

2

3   ## II.   BACKGROUND

4          As the parties are already familiar with the facts of this case, the Court here offers

5   only a brief summary of relevant portions of the statutory framework and extensive

6   administrative record.  Congress enacted the MSA to, among other purposes, "conserve

7   and manage the fishery resources found off the coasts of the United States" and "provide

8   for the preparation and implementation, in accordance with national standards, of fishery

9   management plans which will achieve and maintain, on a continuing basis, the optimum

10  yield from each fishery." 16 U.S.C. § 1801(b)(1), (4).  To accomplish these purposes, the

11  MSA created eight regional fishery management councils, which are composed of fishing

12  representatives and government and tribal officials.  16 U.S.C. § 1852.  These councils

13  must develop and submit fishery management plans ("FMPs") for review by the public and

14  review and approval by NMFS, acting for the Secretary.  16 U.S.C. § 1854(a).  The

15  councils also submit "amendments" to the FMP for NMFS to review and approve when

16  modification of the FMP becomes necessary.  16 U.S.C. § 1852(b), (h)(1).  The Pacific

17  Fishery Management Council (the "Council") governs the fishery at issue in this case.  16

18  U.S.C. § 1852.

19         Beginning in the 1990s, the councils began to regulate certain fisheries by adopting

20  individual fishing quota programs, which limited those who could enter and participate in

21  the fishery by setting a specific quantity of fish each individual fishery participant could

22  harvest.  *Pac. Coast Fed'n of Fishermen's Associations v. Blank* ("*PCFFA*"), 693 F.3d

23  1084, 1087-88 (9th Cir. 2012).  In 2007, Congress reauthorized the MSA and set forth

24  regulations governing "limited access privilege programs," whereby fishery participants

25  receive privileges, or as is the case here, quota share, to harvest a certain portion of the

26  total catch allowed for a particular species, here Pacific whiting.  *Id*. at 1088.   NMFS and

27

28  Environmental Defense Fund (collectively, "Intervenor-Defendants"), they oppose
    Plaintiffs' motion for summary judgment.

*United States District Court*
*Northern District of California*

the Council must structure limited access programs pursuant to certain statutory requirements.  *Id*.  For example, FMPs, amendments, and their implementing regulations, must "be consistent with" ten national standards for fishery conservation.  16 U.S.C. § 1851(a).  The MSA requires that the Secretary establish advisory guidelines (which do not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans.  16 U.S.C. § 1851(b).  The MSA also enumerates seven factors that councils must "take into account" when limiting access to a fishery to achieve optimum yield.  *See* 16 U.S.C. § 1853(b)(6).

Of critical relevance here, the 2007 reauthorization of the MSA requires ,in regard to initial allocation, that:

> In developing a limited access privilege program to harvest fish a Council or the Secretary shall –
>
> (A) establish procedures to ensure fair and equitable initial allocations, including consideration of –
>> (i) current and historical harvests;
>> (ii) employment in the harvesting and processing sectors;
>> (iii) investments in, and dependence upon, the fishery; and
>> (iv) the current and historical participation of fishing communities.
> (B) consider the basic cultural and social framework of the fishery, especially through--
>> (i) the development of policies to promote the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries, including regional or port-specific landing or delivery requirements; and
>> (ii) procedures to address concerns over excessive geographic or other consolidation in the harvesting or processing sectors of the fishery;

16 U.S.C. § 1853a(c)(5)(A)-(B).  Alleging that Federal Defendants failed to adhere to these statutes, Plaintiffs challenge NMFS's 2013 IFQ Allocation.

## A.    *Pacific Dawn I*: The Prior Lawsuit

In *Pacific Dawn I*, the plaintiffs, who were many of the same Plaintiffs in the instant action, challenged the NMFS's Original IFQ Allocation for the Pacific whiting. The actions of the Council and NMFS over the past decade are relevant to both *Pacific*

United States District Court
Northern District of California

*Dawn I* and the instant case.  In January 2004, NMFS published an advanced notice of proposed rulemaking announcing that the Council was considering amending the FMP to implement an individual quota program for the Pacific groundfish limited entry trawl fishery, and that November 6, 2003 would serve as a control date.  69 Fed. Reg. 1563 (Jan. 9, 2004).  The control date served as a public announcement that the Council "may decide not to count activities occurring after the control date toward determining" a person's qualification for or amount of IFQ shares; NMFS warned that groundfish landed after the control date "may not be included in the catch history used to qualify for initial allocation in the trawl IQ program."  *Id*. at 1563-64.  The control date was intended to "discourage increased fishing effort in the limited entry trawl fishery based on economic speculation while the Pacific Council develops and considers a trawl IQ program."  *Id*. at 1564.

In the years that followed, NMFS developed Amendments 20 and 21 to the FMP for Pacific groundfish.  Amendment 20 created a limited access privilege program through which participants in the trawl sector of the fishery received permits to harvest a specific portion of the fishery's total allowable catch via IFQ.  Amendment 21 allocated total allowable catch for certain species in the fishery between the trawl and non-trawl sectors. The final rules implementing the trawl rationalization program set out in Amendments 20 and 21 were issued in October and December 2010, and implementation of the IFQ system began on January 1, 2011.  75 Fed. Reg. 60,869 (October 1, 2010); 75 Fed. Reg. 78,344 (Dec. 15, 2010).  As part of the implementation, the Council decided – and NMFS approved – the Original IFQ Allocation for Pacific whiting to current permit holders based on fishing history associated with such permits from 1994 to 2003 for harvesters, and from 1998 to 2004 for shore-based processors.  *See Pacific Dawn I*, 2011 WL 6748501, at *2.

The plaintiffs in *Pacific Dawn I* argued that defendants failed to consider "current" harvests – and thus violated 16 U.S.C. § 1853a(c)(5)(A)(i) of the MSA – when, in 2010, they based the Original IFQ Allocation on fishing histories from 1994 to 2003 for harvesters and from 1998 to 2004 for processors.  The Court granted summary judgment to plaintiffs on the grounds that the defendants failed to articulate why it was rational to rely

on the 2003 control date for some purposes but not for others.  *See id.* at \*6-8 (observing

that defendants failed to sufficiently explain rationale for examining recent fishing history

for processors, leading to a 2004 cutoff date, and for examining recent harvests up to 2006

for overfished species, but imposing a 2003 cutoff for harvesters without sufficient

analysis or justification).  The Court found that defendants' failure to consider fishing

history beyond 2003 for harvesters and 2004 for processors was arbitrary and capricious.

*Id.* at 8.  The Court remanded the regulations for reconsideration prior to the April 1 start

of the 2013 fishing season.  *See Pac. Dawn, Inc, LLC v. Bryson*, No. C10-4829 TEH, 2012

WL 554950, at \*1 (N.D. Cal. Feb. 21, 2012) ("Remand Order").

## B.    The Reconsideration Process

Following remand, the Council and NMFS underwent an approximately year-long

reconsideration process.  On February 29, 2012 NMFS informed the Council of the

remand order issued in *Pacific Dawn I* and initiated reconsideration of the Original IFQ

Allocations; NMFS provided a potential range of qualifying years for the Council's

consideration, which included alternative allocation formulas with cutoff dates as late as

2007 and 2010.  Administrative Record ("AR") 10,171-72.[3]

In April 2012, NMFS published an Advance Notice of Proposed Rulemaking,

which announced that NMFS was considering a reallocation of whiting quota share and

sought public comment.  *See* 78 Fed. Reg. 72, 73 (Jan. 2, 2013).  NMFS provided the

Council a document entitled "Guidance for Making Allocation Decisions Related to Catch

Shares," which included legal requirements (MSA, National Standards) and agency policy

(NOAA Guidelines and FMP Goals, Objectives and Guidance on Allocations) that – in

addition to the Court's summary judgment order in *Pacific Dawn I* – were "intended to

guide their reconsideration of the initial allocation of whiting."  AR 9543, 13957-71.  On

April 5, 2012, the Council received more than an hour of public comment, including

comments from some of the Plaintiffs and Defendant-Intervenors in this case.  AR 13,891-

---

[3] Citations to "AR" reference documents contained in the administrative record lodged by
Federal Defendants on May 16, 2013 (Docket No. 14).

United States District Court
Northern District of California

1   97.  The Council identified alternatives to analyze, which included the range provided by

2   NMFS and an additional alternative that considered an allocation period of 2000-2010

3   across all sectors.  AR 13893, 13897.

4        When the Council again met in June 2012, NMFS and Council staff gave an

5   overview of the draft Reconsideration Environmental Assessment ("Draft EA") and

6   briefed the Council on the analysis of the range of alternatives.  AR 14,128-35.  After

7   receiving recommendations from its advisory bodies and considering public testimony, the

8   Council refined one alternative and requested updated analysis based on the refinement as

9   it took additional time to consider the analyses and information presented.  *Id.*

10       On September 17-18, 2012, the Council considered the revised Draft EA, which

11  contained more detailed information and analysis of a range of whiting allocation periods

12  spanning the years between 1994 and 2010 for shore-based and mothership catcher

13  vessels,[4] and the years between 1998 and 2010 for shore-based processors.  AR 14,739-52;

14  *see also* Final Environmental Assessment and Magnuson-Stevens Act Analysis ("Final

15  EA"), AR 3035.  The Council held nearly seven hours of public testimony and also

16  received advisory body reports.  AR 14,739-52.  Following Council discussion, the

17  Council voted to select the status quo or No-Action Alternative, which continued to

18  allocate whiting based on qualifying years of 1994 through 2003 for the shore-based and

19  mothership catcher vessels and 1998 through 2004 for shore-based whiting processors) as

20  the final preferred alternative.  *Id.*

21       On October 30, 2012, the Council transmitted to NMFS its recommendation to

22  adopt the No-Action Alternative.  AR 15,405-12.  On December 17, 2012, NMFS

23  circulated its Decision Memorandum, which reviewed the Council record and

24  preliminarily determined that the Council's recommendation to maintain the existing initial

25  whiting allocations was consistent with the MSA, the FMP, and the Court's summary

26

27  [4] Mothership catcher vessels are harvest vessels that process fish at sea.  Plaintiffs'
    Complaint does not include a cause of action specifically related to the mothership sector
28  and Plaintiffs did not explicitly move for summary judgment with regard to the mothership
    sector of the fishery.

United States District Court
Northern District of California

judgment order in *Pacific Dawn I*.  Dec. 17, 2012 Decision Memorandum, AR 9541-9573 ("Dec. 2012 Decision Memo").

On January 2, 2013, NMFS issued a proposed rule to accept the Council's preferred alternative of retaining the status quo, with a 30-day public comment period.  78 Fed. Reg. 72.  Nineteen comments were received, with fifteen in support of maintaining the initial whiting allocation, three comments in opposition, and one that took no position.  Mar. 13, 2013 Decision Memorandum, AR 9738-69, 41 ("Mar. 2013 Decision Memo").  After analyzing issues voiced during the public comment period, NMFS again reviewed the record and the Council's recommendation in relation to the MSA requirements, including the factors debated during reconsideration and the claims Plaintiffs raise here.  AR 9738-67.  NMFS concluded that the recommendation to retain the initial whiting allocations was fair and equitable and consistent with the MSA.  AR 9750.  On March 28, 2013, NMFS issued the Final Rule maintaining the Original IFQ Allocations in the 2013 IFQ Allocation, which also included responses to public comment addressing many of the issues Plaintiffs raise in this case.  AR 7569; 78 Fed. Reg. 18,879.

## C.     The Instant Case

Plaintiffs filed this suit on March 29, 2013, which alleges that Federal Defendants violated the MSA and APA when they adopted the 2013 IFQ Allocation, which retained the Original IFQ Allocation.  The Complaint contains six causes of action, which allege that the Federal Defendants:

> (1)     violated the MSA in failing to properly consider and credit fishing history after 2003 for dependent Pacific whiting trawling vessels;
>
> (2)     violated the MSA in failing to properly consider and credit processing history after 2004 for dependent whiting shoreside processors;
>
> (3)     violated the MSA's National Standard 5 for failing to properly consider efficiency in designing the initial allocation of IFQ;
>
> (4)     violated the MSA's National Standard 7 for failing to minimize costs in designing the initial allocation of IFQ;

(5)     violated the MSA's National Standard 8 for failing to take into account the needs of fishing communities and to provide for sustained participation of such communities in the Pacific whiting fishery; and

(6)     violated the APA because the initial allocation of IFQ for the Pacific whiting fishery was arbitrary and capricious and an abuse of discretion.

Compl. ¶¶ 32-52.  Plaintiffs moved – and Federal Defendants and Intervenor-Defendants cross-moved – for summary judgment on all causes of action.

## III.    LEGAL STANDARD

A court shall set aside regulations adopted under the MSA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); 16 U.S.C. § 1855(f)(1)(B) (adopting the standards for judicial review under 5 U.S.C. § 706(2)).  This is a "highly deferential" standard of review, and an agency's action is presumed to be valid and should be affirmed "if a reasonable basis exists for its decision."  *PCFFA*, 693 F.3d at 1091 (internal quotation marks and citation omitted).  In establishing procedures "to ensure fair and equitable initial allocations" of quota share for Pacific whiting, NMFS was required to "take into account" the factors enumerated at 16 U.S.C. § 1853(b)(6), to "consider" the factors enumerated in 16 U.S.C. § 1853a(c)(5)(A)(i)-(iv), and to ensure that the Council's FMP and amendments were "consistent" with the ten national standards set forth in the MSA.  16 U.S.C. § 1851(a).

A reviewing court's "only task is to determine whether the Secretary has considered the relevant factors and articulated a rational connection between the facts found and the choices made."  *Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002).  The court "cannot substitute [its] judgment of what might be a better regulatory scheme, or overturn a regulation because it disagree[s] with it, if the Secretary's reasons for adopting it were not arbitrary and capricious."  *Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996).  Review is generally "limited to the administrative record on which the agency based the challenged decision."  *Fence Creek*

United States District Court
Northern District of California

9

*Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).  While the record may be expanded in "narrowly construed circumstances," *id.*, no party has asked the Court to supplement the administrative record here.[5]

## IV.   DISCUSSION

Upon reviewing the parties' well-made arguments and the voluminous administrative record, the Court concludes that Federal Defendants considered the relevant statutory factors, vetted quota alternatives, articulated a rational connection between the facts found, and reasonably decided to retain the Original IFQ Allocation in the 2013 IFQ Allocation.  While the Court is sympathetic to the members of the fishing community who might receive a smaller initial allocation of quota share under the 2013 IFQ Allocation formula, the Court does "not have the authority to substitute [its] judgment for the Secretary's with regard to allocation of all the quota shares." *Alliance Against IFQs*, 84 F.3d at 350.  Federal Defendants have shown compliance with the statutory requirements under the MSA and APA, and their 2013 IFQ Allocation is entitled to deference.  Accordingly, the Court GRANTS summary judgment for Federal Defendants and Intervenor-Defendants on all causes of action, for the reasons detailed below.

### A.   NMFS Complied with the MSA in Adopting the 2013 IFQ Allocation as Applied to Harvesters and Processors.

Plaintiffs argue that NMFS "rubber-stamped" the Council's recommendation to retain the 1994-2003 and 1998-2004 participation qualifying years for harvesters and processors, and rejected alternative allocation formulas that would have reflected more recent fishing history and dependence on the fishery, thereby disadvantaging Plaintiffs.  Pls. Mot. at 14 (Docket No. 48).  Plaintiffs identify numerous purported inconsistencies and deficiencies in support of their First and Second Causes of Action, which challenge Federal Defendants' 2013 IFQ Allocation for harvesters and processors, respectively.  The

---

[5] The Court need not take judicial notice of the December 2011 Fishery Management Plan, per Plaintiffs' request, as it appears in the administrative record at AR 2066-2223.

Court, however, finds that these challenges are without merit in light of the adminstrative record.

### i.    Federal Defendants Properly Considered Whether to Credit Fishing History After 2003 for Pacific Whiting Harvesters (<u>First Cause of Action</u>).

Plaintiffs' First Cause of Action takes issue with the 2013 IFQ Allocation as applied to harvesters.  Plaintiffs' argument and citations to purported inconsistencies in the administrative record are part of their global argument that NMFS must have violated the MSA by failing to consider and credit fishing history, investment and dependence in the fishery after 2003 for harvesters, and if they did consider it, they failed to do so reasonably because the 2013 IFQ Allocation retained the 2003 cutoff.  *See* Pls. Mot. at 13-20. However, taking into account the 16 U.S.C. § 1853(b)(6) factors and considering the 16 U.S.C. § 1853(a)(C)(5) factors do not mandate a particular allocation of quota share because "[t]here is nothing in the MSA that guarantees [a particular group] a directed . . . fishery." *PCFFA*, 693 F.3d at 1093 (citing *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 896 (9th Cir. 2010)).

NMFS took into account and considered current and historical harvests and participation in the fishing communities as applied to harvesters, as required by 16 U.S.C. § 1853(b)(6)(A)-(B) and § 1853a(c)(5)(A)(i), (iv).  Indeed, "Congress left the Secretary some room for the exercise of discretion, by not defining 'present participation,' and by listing it as only one of many factors which the Council and the Secretary must 'take into account.'" *Alliance Against IFQs*, 84 F.3d at 347.  The Council and the NMFS considered four allocation alternatives, many of which took into consideration recent fishing history for whiting harvesters.  These four alternatives for harvesters and their respective qualifying periods were: Alternative 1 (1994-2003), which for harvesters was the same as the status quo or No Action Alternative; Alternative 2 (1994-2007); Alternative 3 (1994-2010); and Alternative 4 (2000-2010).  AR 3062.  The record reflects that NMFS "considered the potential advantages of the alternatives favoring more recent history" but determined that, on balance, the advantages of favoring more recent allocations were

United States District Court
Northern District of California

1   outweighed by the advantages of maintaining the existing allocations, as recommended by

2   the Council.  AR 9499.

3          For example, NMFS reviewed quota concentration – who received IFQ –  under the

4   various alternatives as opposed to the No Action Alternative, which retained the initial

5   1994-2003 IFQ qualifying period for harvesters.  NMFS observed:

6              Alternatives 2, 3 and 4 would allocate QS [or Quota Share] to 6
              permits that would not otherwise receive QS based on permit catch
7              history from whiting targeted trips . . . Alternative 4 would allocate
              the most to this group, a total of 3.0 percent to all permits in the
8              group and a maximum of 1.3 percent to any one permit in the group.
              Alternative 2 would benefit 27 permits (6 permits that newly
9              qualifying for QS based on whiting catch history and 21 previously
              qualifying permits) while reducing the allocation of 38 permits.  A
10             total of 6.3 percent of the QS would be redistributed under
              Alternative 2.   Alternative 3 would benefit 25 permits (6 newly
11             qualifying permits and 19 previously qualifying permits, while
              reducing the allocation of 40 permits. A total of 9.0 percent of the
12             QS would be redistributed under Alternative 3.  Alternative 4 would
              benefit 28 permits (6 newly qualifying permits and 22 previously
13             qualifying permits, while reducing the allocation of 37 permits (25
              permits with reduced allocations and 12 permits which would
14             receive no allocation based on permit catch history).  A total of 17.4
              percent of the QS would be redistributed under Alternative 4.
15

16  Final EA Section 4.3.1, AR 3132.  The Final EA considered current and historical permits

17  and participation.  The NMFS concluded that "basing initial whiting allocations on

18  alternatives that include more recent history would generally have the effect of

19  concentrating quota for harvesters in fewer hands, creating fewer winners and more losers

20  compared to maintaining the existing allocations."  AR 9746.

21         In addition, NMFS weighed competing policy concerns against the perceived

22  benefits of adopting a more recent history allocation.  NMFS determined that maintaining

23  the Original IFQ Allocation in the 2013 IFQ Allocations outweighed the advantages of the

24  more recent history alternatives for several reasons.  First, it honored the 2003 control date,

25  which reduced overcapitalization of the fishery and ended the "race for fish" by

26  discouraging speculative capitalization and effort in the fishery by putting participants on

27  notice that any fishing history earned beyond 2003 may not count towards a future

28  allocation system.  Second, it minimized consolidating quota share in fewer hands, which

United States District Court
Northern District of California

1   furthered the MSA policy of avoiding excessive shares (e.g., 16 U.S.C. § 1851(a)(4)).

2   Third, it ensured a more even geographic distribution of catch shares along the coast and to

3   corresponding fishing communities because shifting to alternatives favoring more recent

4   history would contribute to a northward shift in quota shares, which would come at a cost

5   to historic fishing communities in more southern locations, contrary to the goals of

6   Amendment 20's intention to protect historic fishing communities from the potential

7   impacts of the new rationalization program.  AR 9499-9500.

8       The record therefore reflects that the Federal Defendants appropriately considered

9   current and recent harvests and participation in the fishery by analyzing Alternatives 2, 3,

10  and 4, pursuant to 16 U.S.C. § 1853a(c)(5)(A)(i), (iv) and §1853(b)(6), and articulated

11  sufficient reasons for their decision to adopt the 2013 IFQ Allocation.  Federal Defendants

12  therefore complied with the MSA and APA in this regard.

### a.  The "Latent" Permits.

14      In addition to considering current and recent harvests and participation in the

15  fishery, Federal Defendants are required to consider "investments in, and dependence

16  upon, the fishery" in establishing procedures to ensure fair and equitable initial allocations

17  of IFQ.  16 U.S.C. § 1853a(c)(5)(A)(iii).  Plaintiffs advance numerous contentions that fall

18  under the general argument that Federal Defendants inappropriately or inconsistently made

19  their consideration of investments and dependence on the fishery in promulgating the 2013

20  IFQ Allocation.  These arguments do not withstand scrutiny.

21      Many of Plaintiffs' arguments flow from the fact that the 2013 IFQ Allocation has

22  the result of allocating IFQ to 34 "latent" or inactive permit holders with historical catch

23  history but no recent history; in particular "approximately 10.2 percent of quota allocated

24  to 20 shore-based harvesting permits and 9.6 percent of quota allocated to 14 mothership

25  permits that had no whiting landings post 2003."  Pls. Mot. at 14; AR 9669.  Plaintiffs

26  argue that had NMFS credited later fishing history, IFQ allocation would be distributed to

27  actors such as Plaintiffs who have in recent years demonstrated more of a dependence on

28

United States District Court
Northern District of California

the fishery than these latent permit holders, who by implication, are not dependent.[6]  The evidence, however, indicates that the charges of "latency" are overblown, and that, at any rate, NMFS considered the issue and articulated its reasons for adopting the 2013 IFQ Allocation.

During reconsideration, NMFS acknowledged that some quota was allocated to some permits that did not directly participate by harvesting or landing whiting in the fishery between 2004 and 2010.  NMFS concluded, however, that this fact did not warrant including more recent years in the qualifying period because many of the permit owners owned other permits that were active in the whiting fishery during those years, participated in other fisheries including other sectors of the whiting fishery, or held those inactive permits as part of a larger investment strategy – and thus reflected participation and investment in and dependence upon the fishery.  78 Fed. Reg. at 18,883; AR 9748.  For example, the initial quota was allocated to the permit owner at the time of the initial allocation and reflects the investment of participation in the permit because the permit must be renewed annually.  78 Fed. Reg. at 18,883-84.  Moreover, permits that are leased or sold to other participants further reflects recent participation and investment because recipients can position themselves to receive initial allocation that would support intended future fishing strategies.  *See* AR 3101 (Final EA describing that 18 permits changed hands after 2003); 78 Fed. Reg. at 18884.

Federal Defendants also present evidence that the majority of these 34 latent permits with no fishing history after 2003 were not truly inactive because their holders

---

[6]  Plaintiffs also reference a June 2010 Final Environmental Impact Statement that states "likely impacts on the initial QS allocation appear to be minimal with respect to their impact on the landing history portion of the allocation."  Pls. Mot. at 14 (citing AR 882). Plaintiffs argue that the 2010 EIS's statement of "minimal" impact is contradicted by the Final Regulatory Flexibility Analysis that accompanied the 2013 Decision Memorandum, which found that under Alternative 4 (a 2000-2010 qualifying period for harvesters) 17 percent of quota ($3.7 million) of allocation to shore-based catcher vessels would be transferred from status quo permit holders to those with greater history in the shore-based fishing sector.  AR 3429.  To the extent this is an inconsistency, it is moot as Federal Defendants during reconsideration considered the potential allocation distribution under the alternatives, including Alternative 4, and rationally rejected the alternatives in favor of the 2013 IFQ Allocation.

chose to use the permits in different sectors of the fishery. NMFS defines "truly latent" permits as those that received either mothership catch history assignment or shore-based quota share allocations where the permit itself was not fished in either the mothership fishery or the shore-side whiting fishery, and the owner of the permits also did not fish other owned permits in the mothership or shore-side whiting fishery after 2003. 78 Fed. Reg. at 18884. NMFS presented evidence that, for example, of the 21 permits with some activity in the shore-side whiting fishery but no post-2003 activity in that fishery, 4 were on vessels active in the mothership fishery, and of the 13 permits with no post-2003 activity in the mothership fishery, 8 were on vessels active in the shore-side whiting fishery. *See* Final EA, AR 3195. Taking into account that fishing enterprises may retain a permit for use in a different sector, as described above, NMFS then concluded that only 15 permits were on vessels that showed no activity in any West Coast or Alaskan fisheries after 2003; of those 15, 6 permits were held by fishing enterprises that held other limited entry trawl permits that were active. *Id*. NMFS speculated that many of these permits were probably being maintained by active fishing enterprises as an investment to support their active fishing vessels or as part of a larger investment portfolio. *Id.*; 78 Fed. Reg. at 18883; *see also infra* at Part IV(A)(1)(b) (discussing portfolio investment). NMFS ultimately determined after accounting for participation in other sectors and fisheries, including those off Alaska, there were a total of only nine permits (shore-based and mothership) where the owner apparently had no fishing history off the West Coast or Alaska after 2003. These truly latent permits amount to 1.3 percent of the shore-based quota share and 1.0 percent of the mothership catch history assignment used for the 2011 and 2012 fisheries. 78 Fed. Reg. at 18883-84. On this basis, NMFS concluded that the Original IFQ Allocation, as retained by the 2013 IFQ Allocation, allocated only a small portion of quota to permits that are held by owners that did not participate in the fishery or who owned other permits that did participate after 2003. 78 Fed. Reg. at 18883; *see also* AR 3195, 9748. The Court agrees that NMFS took into account and considered the latency issue in the context of 16 U.S.C. § 1853(b)(6) and § 1853a(c)(5)(A), and thus

15

1    complied with the MSA when it determined that these latency issues did not warrant

2    including more recent years in the qualifying period.

3           Moreover, NMFS presented data that countered Plaintiffs' suggestion that these

4    "latent" permits could detrimentally return to the fishery and add overcapacity.  Federal

5    Defendants cite evidence that appears to show that the fishery is approaching optimal yield

6    in its first year of operation, and that the 2011 fishery operated efficiently for harvesters

7    and processors.  *See* AR 16362 (the 2011 fishery attained 98.3 % of the Pacific whiting

8    catch limit); AR 16328-31 (significant increases in landings and revenues, with significant

9    decreases in bycatch).  Plaintiffs do not demonstrate how latency, especially when truly

10   latent permits constitute only 1.3 % of the shore-based sector quota, could impact the

11   achievement of optimum yield in a program where the quota is transferable and can move

12   toward its more efficient use, as it appears to have done in the first year of operation.

13   Thus, on the record before the Court, NMFS examined issues surrounding latent or

14   inactive permits and articulated reasons why latency did not contradict its decision to

15   implement the 2013 IFQ Allocation.  Federal Defendants have therefore complied with the

16   MSA and APA.

17

18           **b.  Measures of Dependence and Plaintiffs' Challenge to "Portfolio Investments."**

19           Plaintiffs also challenge Federal Defendants' analysis of dependence by crediting

20   "portfolio investment" – viewing one measure of dependence and investment in the fishery

21   as those who may passively hold latent permits as part of an investment strategy – versus

22   those who, like Plaintiffs, invested in the market by actively fishing their permit after the

23   2003 control date.  Specifically, Plaintiffs argue that Federal Defendants inappropriately

24   defined dependence to include holders of latent portfolio permit activity and those

25   operating in other fisheries, failed to weigh the pros and cons between these types of

26   investments and dependence, and did not consider that use of portfolio investments will

27   lead to increased capacity when "latent" permits re-enter the fishery.

28           The record, however, supports that Federal Defendants fully took into account and

United States District Court
Northern District of California

1  considered these issues in their analysis of "investments in, and dependence upon, the

2  fishery" in establishing procedures surrounding the 2013 IFQ Allocation pursuant to 16

3  U.S.C. § 1853a(c)(5)(A)(iii).  First, Plaintiffs err in faulting Federal Defendants'

4  application of the term "dependence."  As NMFS explained, the "MSA does not provide a

5  definition of 'dependence.'  Nor are there any specific NMFS guidelines on how

6  'dependence' is to be defined, or once defined, measured."  AR 9487.  While Plaintiffs cite

7  *Alliance Against IFQs*, 84 F.3d 343 and *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1068

8  (9th Cir. 2005) for the proposition that greater history and active recent participation

9  reflect dependence on a particular fishery, Pls. Mot. at 20, no authority mandates that

10  dependence must be limited to recent active participation to the exclusion of other factors

11  within NMFS's discretion to analyze.  Indeed, the court in *Yakutat* recognized this

12  flexibility when it upheld a final rule that was based on a "decision [that] established a

13  standard for measuring historical dependence, and drew a rational line" after evaluation of

14  alternatives.  *Yakutat*, 407 F.3d at 1067.  Here, the NMFS noted that "dependence upon the

15  fishery relates to the degree to which participants rely on the whiting fishery as a source of

16  wealth, income, or employment to financially support their business," and that "[c]urrent

17  harvests, historical harvests, levels of investment over time, and levels of participation

18  over time are all aspects of dependence, as they can all be connected to the processes that

19  fishers and processors use to generate income."  78 Fed. Reg. at 18884; AR 9487.  The

20  Court finds nothing arbitrary or capricious about such a definition of dependence.

21  Given that NMFS, in its discretion, adopted a broad interpretation of dependence, it

22  was neither arbitrary nor capricious for NMFS to view one measure of dependence as how

23  fishermen hold rely upon whiting limited entry permits as one part of their portfolio of

24  investment or overall business plan.  For example, dependence may take the form of

25  "recover[ing] investments or provid[ing] a backup fishery during downturns in other

26  fisheries."  AR003159; *see also* AR009490 (discussing that many participants in the

27  whiting fishery also engage in other fisheries and may have a portfolio that contains

28  limited entry trawl permits along with permits to crab, shrimp, or to fish in the Alaska

17

United States District Court
Northern District of California

Pollock fishery as part of a business strategy to respond to ups and downs in various fisheries).  While Plaintiffs claim that consideration of a permit holder's participation in other fisheries is inconsistent with 16 U.S.C. § 1853(b)(6)'s use of the phrase "establish a limited access system for *the* fishery") (emphasis added), Plaintiffs cite to no authority holding that it would be arbitrary or capricious or otherwise improper for NMFS to recognize that fishermen may participate in multiple fisheries and hold multiple permits to do so, and to craft a policy for *the* fishery that reflects that reality.

Second, NMFS did not err in examining various aspects related to dependence, including analysis of the economic shifts to participants under various alternatives, discussions of various ways to measure dependence, analysis of latency, and how dependency is weighed against other factors.  AR 9485-94.  While Federal Defendants may not have engaged in a specific cost-benefit analysis of investment and dependence of those who hold permits as part of a portfolio of permits versus those who do not, NMFS addressed Plaintiffs' latency argument and the record reflects that NMFS examined the alternative allocation formulas and weighed multiple additional policy factors related to dependence in arriving at their decision to adopt the 2013 IFQ Allocation.

Third, Plaintiffs' argument that Federal Defendants' definition of "investment" confers protectable status on a revocable fishing permit as a property interest is unpersuasive.  Pls.' Opp. at 10-11 (Docket No. 56).  Nothing in the record suggests Federal Defendants treated permits as compensable property rights, in violation of 16 U.S.C. § 1853a(b), but rather reasonably treated ownership of a permit as one measurement of current investment and recent participation in, and dependence upon, the fishery.

Fourth, while Plaintiffs maintain that allocation of IFQ to apparently latent permits encourages their reentry into the fishery, Plaintiffs present no evidence that this reentry occurred or otherwise worked against the goal to reduce capacity in the fishery.  *Cf.* AR 3110, 16328-31, 16362 (indicating that the 2011 fishery is approaching optimal yield).

Based on the record before the Court, Federal Defendants considered investment in and dependence upon the fishery, including the concerns raised by Plaintiffs, articulated a

rational reason for adopting the 2013 IFQ Allocation, and therefore did not act in an arbitrary or capricious manner in violation of the MSA.

### c.   The Control Date and Delay in Implementation.

Plaintiffs also challenge the "inordinate emphasis" Federal Defendants placed on control dates in the absence of any statutory authority mandating such emphasis. Pls. Mot at 19. Courts have upheld control dates for their important public policy purposes: to curb speculative over-investment and overfishing – which is what the regulations are meant to restrain – during the period in which the same regulations are reviewed and developed. *See Alliance Against IFQs*, 84 F.3d at 347-48. As a preliminary matter, the Court previously held that the 2003 control date was procedurally valid. *Pacific Dawn I,* 2011 WL 6748501, at *4. Upon reconsideration, NMFS acknowledged that a control date is not a "guarantee that any specific period will count toward initial allocations," but NMFS also believed that recognition of the business and investment decisions made by participants who interpreted the control date as signaling the likely end of the qualifying period was consistent with the purpose of Amendment 20 to create a limited access privilege program. 78 Fed. Reg. at 18880. Moreover, the use of control dates has a deterrent effect – it prevents increases in effort or capitalization that would undermine conservation and management goals pending development of a limited access privilege program. *Id.* Lastly, and critically, all participants were on notice that the control date might exclude participation after November 6, 2003, including the recent participation advocated by Plaintiffs. AR 9566-67. Based on these factors, NMFS concluded that the "positives associated with honoring the control date outweigh the positives associated with relying on more recent history." AR 9566-67. The Court finds that Federal Defendants reasonably adopted the control date and articulated a rational reason for its emphasis in the 2013 IFQ Allocation.

Moreover, the delay between the 2003 and 2004 cutoff dates of the participation periods for harvesters and processors and promulgation of the Final Rule in 2013 was reasonable. The court in *Alliance Against IFQs* found that while a three-year gap between

the end of the participation period considered and the promulgation of the rule "pushed the limits of reasonableness," the participation cutoff date was not "so far from 'present participation'" as to be arbitrary or capricious.  84 F.3d at 348.  Previously, the Court noted that "it may be that the increased factual complexity" of the Pacific groundfish IFQ program "would, indeed, render the delays in this case reasonable."  *Id*. at *6.  Indeed, the administrative record documents the complexity of the trawl rationalization program and the effort put in by the Council and Federal Defendants to implement it.  *See* 78 Fed. Reg. at 18889 (Comment 20 and Response).  "The process required to issue a regulation," the process of review, publication, public comments, review of public comments, in addition to the prior litigation and reconsideration process mandated by the Court's Remand Order in *Pacific Dawn I* "necessarily caused substantial delay" between the 2003 and 2004 end dates of the participation periods and the promulgation of the Final Rule in 2013.  *Alliance Against IFQs*, 84 F.3d at 347.  Additionally, during reconsideration, NMFS considered alternatives that took into account more recent participation and reasonably rejected them in favor of the Original IFQ Allocation.  The Court therefore concludes that the Federal Defendants' delay between the 2003 and 2004 end dates for "present participation" periods was reasonable because present participation need not be "contemporaneous with the promulgation of the final regulations," *id*., and because Federal Defendants have presented evidence justifying the delay in light of the factual complexity and procedural history of the process.

### d.  Recent Participation Requirement for Processors but Not Harvesters.

Plaintiffs argue that NMFS provides no reasonable explanation for why it provided a recent participation requirement for processors but not for harvesters.  Pls. Mot. at 15. For harvesters, although harvests beyond 2003 were not included, recent participation was taken in to account by allocating quota share based on fishing history to only current limited entry trawl permit owners.  AR 9745.  In examining Alternative 4, NMFS considered fishing history between 2000 and 2010, in effect, a recent participation

20

requirement, but reasonably rejected that alternative.  For processors, recent participation was taken into account by not allocating quota to companies that no longer exist, and instead distributing quota to existing companies in proportion to the size of their quota allocations under the existing initial allocations.  *Id.*  The record reflects that because processors did not have a similar permit requirement to operate in the fishery as did harvesters, the recent participation requirement was imposed to require some level of dependence and involvement in the fishery in return for the twenty percent allocation of quota share to shore-based processors.  *Id.*  Based on this rationale, Federal Defendants articulated a reason for why no formal "recent participation" requirement was imposed on harvesters.

In light of the above, the Federal Defendants considered the relevant factors and articulated a rational connection between the facts found and the 2013 IFQ Allocation with regard to harvesters.  Federal Defendants' and Defendant-Intervenors' cross-motions for summary judgment are therefore GRANTED on the First Cause of Action, and Plaintiffs' motion is DENIED.

> ### ii. Federal Defendants Properly Considered Whether to Credit Processing History After 2004 for Pacific Whiting Shore-based Processors Despite Recent Changes in the Fishery (<u>Second Cause of Action</u>).

Plaintiffs' Second Cause of Action alleges Federal Defendants failed to take into account local processors' active participation and investment in, and dependence upon, the Pacific whiting fishery after 2004, especially in light of changes to the fishery during that time.  Plaintiffs raise several arguments in support of their motion, all of which fail upon review of the administrative record.

First, Federal Defendants reasonably explained the difference in end dates for harvesters versus processors, as well as the recent participation requirement for processors. The first notice of the November 6, 2003 control date posted in Federal Register on January 9, 2004 was unclear as to whether the control date applied to processors as well as harvesters.  *See* AR 3203-04.  Because processors did not have adequate notice until subsequent announcements during the 2004 and 2005 whiting seasons, NMFS decided to

apply the 2004 rather than the 2003 cutoff to participation period for processors, which was not arbitrary or capricious.  *Id.*

Second, Plaintiffs contend that the 2013 IFQ Allocation does not take into account processors' support of the fishery over the last ten years, including the expenditure of capital improvements to facilities and improved operations, which in turn benefits fishing vessels and local communities.  Thus, Plaintiffs argue the 2013 IFQ Allocation violates the MSA because it does not take into account "the economics of the fishery" or "the cultural and social framework relevant to the fishery and any affected fishing communities" and fails to consider "employment in the harvesting and processing sectors" or "investments in, and dependence upon, the fishery."  *See* 16 U.S.C. §§ 1853(b)(6)(C), (E) & 1853a(5)(A)(ii), (iii).  They contend that if Federal Defendants had credited later processing history instead of "a subset of processors who may have left the fishery" after 2004, Plaintiffs Ocean Gold and Jessie's would have been awarded greater additional IFQ allocation, saving them from having to lease or buy IFQ to maximize their operations.

Plaintiffs' argument fails because Federal Defendants considered at length whether to credit more recent fishing history in the 2013 IFQ Allocation.  Plaintiffs apparently recognize this when they cite Alternative 4 (2000-2010 for processors) and note that allocation under it would have shifted north the overall quota allocation to processors.  Pls. Mot. at 21.  Federal Defendants considered Alternative 4 and the approximately two percent northern shift to processors it would create versus the Original IFQ Allocation, but reasonably rejected it because NMFS concluded that maintaining the Original IFQ Allocation supports historic fishing communities in more southern locations and creates a wider geographic distribution of the initial benefits associated with allocations.  AR 9667-68.  Moreover, the deterrent rationale of the control date was equally applicable to processors after 2004, once they had been placed on notice.  78 Fed. Reg. 18889 (Comment 23 and Response).  Thus, the Federal Defendants evaluated alternatives that took into account the economics of the fishery and the cultural and social framework relevant to the fishery and the fishing communities and considered employment in the

1  processing sector and their investment in and dependence upon the fishery. NMFS

2  reasonably rejected alternatives favoring more recent fishing history because of their

3  adverse geographical impact and policy concerns related to the integrity of the control

4  date.

5      Lastly, the Court's earlier concerns with Federal Defendants' explanation as to why

6  the qualifying period for processors was extended to 2004 apparently on the basis to

7  benefit a single processor, *Pacific Dawn I*, 2011 WL 6748501, at *7, were sufficiently

8  addressed during reconsideration. NMFS explained that the 2004 cutoff date was adopted

9  because (1) the 2003 cutoff date for processors was inadequately noticed and (2) crediting

10 investments and processing history before 2004 is consistent with discouraging speculative

11 increases in capacity after the control date and minimizes disruption to processors who

12 invested under the old management regime prior to the changes in the regulatory system as

13 applied to processors. AR 3404, 14747-48; 78 Fed. Reg. at 18882, 18886.

14     "The Secretary is allowed, under [controlling precedent], to sacrifice the interest of

15 some groups of fishermen for the benefit as the Secretary sees it of the fishery as a whole."

16 *Fishermen's Finest*, 593 F.3d at 899 (citing *Alliance Against IFQs*, 84 F.3d at 350). Under

17 the 2013 IFQ Allocation, Plaintiffs Ocean's Gold and Jessie's may receive less IFQ

18 allocation than under some of the considered alternatives, but there is nothing in the record

19 to suggest Federal Defendants sacrificed their interests in a manner that was arbitrary and

20 capricious or otherwise not in accordance with law. The Federal Defendants considered

21 the relevant factors and articulated a rational connection between the facts found and 2013

22 IFQ Allocation with regard to the 2004 cutoff date for processors. Federal Defendants'

23 and Defendant-Intervenors' cross-motions for summary judgment are therefore

24 GRANTED on the Second Cause of Action, and Plaintiffs' motion is DENIED.

25

26     **B.    Retention of the Original IFQ Allocation Did Not Violate the Fishery
            Management Plan or National Standards.**

27     Any FMP must "be consistent with" with the ten national standards set forth at 16

28 U.S.C. § 1851(a). *Yakutat, Inc.*, 407 F.3d at 1068. The "[n]ational [s]tandards do not

United States District Court
Northern District of California

23

require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis." *PCFFA*, 693 F.3d at 1093 (citation omitted).  The Court discerns no violation of the MSA or APA with regard to the national standards and the 2013 IFQ Allocation.

> ### i.   National Standards 5 and 7 (<u>Third and Fourth Causes of Action</u>).

The parties cross-moved for summary judgment on Plaintiffs' Third and Fourth Causes of Action, which allege that NMFS violated National Standards 5 and 7.  Under National Standard 5, "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."  16 U.S.C. § 1851(a)(5).  Under National Standard 7, "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication."  16 U.S.C. § 1851(a)(7).  Plaintiffs argue that Federal Defendants violated National Standards 5 and 7 by failing to analyze how retaining the Original IFQ Allocation in the 2013 IFQ Allocation creates inefficiency and does not minimize costs.  As examples, they point to the potential for inactive or latent permit holders who have been inefficiently allocated IFQ to return to the fishery, thus adding unwanted fishing capacity.  Similarly, Plaintiffs argue that these inactive permit holders can extract from more active members of the fishing community high lease and sale costs for fishing quota, figures that would be minimized had the Federal Defendants credited more recent history in the initial IFQ allocation.

The administrative record reflects, however, that NMFS considered efficiency, minimization of costs, and avoidance of unnecessary duplication, where practicable, under its analysis of the national standards.  First, as discussed above, the Council and NMFS analyzed the "latent" permit issue and found it to be de minimus.  *See supra* at Part IV(A)(i)(a).  Concerns that "latent" permit holders could return and add to overcapacity are thus overstated, and there is no evidence that the number of permits being fished increased in 2011, the first year of the program.  AR 3110 (Final EA describing that 39 permits with shore-based landings history did not participate in the 2011 fishery but most permits that

United States District Court
Northern District of California

24

remained landed "substantially" more fish than they received in initial allocation). Furthermore, the ability to lease and sell the whiting allocation is consistent with the requirement to establish a policy of transferability via lease or sale.  16 U.S.C. § 1853a(c)(7).

Second, NMFS explicitly considered economic lease and sale costs, as well as efficiency issues.  For example, NMFS

> considered how the short and long term impacts of leasing may vary between the alternative whiting allocations and has concluded that the benefits of more heavily favoring history prior to the end of the existing qualifying periods furthers the purposes of Amendment 20 [creation of a limited access privilege program], rewards investments and dependence consistent with the policies underlying announcing a control date, and minimizes disruption to those participants that made business decisions based on the assumption that quota formulas were unlikely to include more recent years.

78 Fed. Reg. at 18,886.  Third, the Final EA analyzed the effects of the alternatives on efficiency and net economic benefit; NMFS determined that leasing costs would occur under any of the alternatives considered, and that "the benefits of the program (which requires an initial allocation) outweigh the costs, and that, ultimately, quota will tend towards the most efficient users, especially once trading is allowed."  *Id.* at 18887; *see also* AR 3215-16.  Thus, the administrative record indicates that Federal Defendants appropriately considered and analyzed issues related to efficiency, minimization of costs, and unnecessary duplication.

Plaintiffs nevertheless contend, notwithstanding the evidence in the record, that the agency "failed to reasonably" explain its decision in the context of minimizing disruption to the fishery.  However, the Final EA explained that "what is at stake in the initial allocation is not necessarily a disruption to what entities are able to harvest, but rather an initial allocation of wealth and, through the wealth represented by the [quota share/catch history assignment], an augmented ability to make up any shortfalls through [quota share/catch history assignment] acquisitions in the market place."  AR 3201.  Given that quota is transferable, entities seeking to makeup shortfalls can acquire additional quota on the marketplace, and mitigate any disruption caused by the initial allocation of quota share.

1    These explanations for why any disruption would be mitigated by the control date and

2    quota transferability, AR 3221, show the Federal Defendants considered the relevant

3    factors and articulated a rational connection between the facts found and the choices made

4    with regard to complying with National Standards 5 and 7.

5         Ultimately, "the fact that some inefficiencies may exist in a conservation and

6    management system does not make the system inconsistent with National Standard Five."

7    *Connecticut v. Daley*, 53 F. Supp. 2d 147, 172 (D. Conn. 1999).  Nor must the Federal

8    Defendants "conduct a formal cost/benefit analysis under National Standard Seven."  *Id*.

9    (citing *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987)).

10        On the record before the Court, Federal Defendants considered the relevant factors

11   related to "efficiency in the utilization of fishery resources," minimization of costs and

12   avoidance of unnecessary duplication, and thus acted consistently with National Standards

13   5 and 7, and articulated the reasons why the 2013 IFQ Allocation were chosen over

14   competing alternatives in the record.  Therefore, the 2013 IFQ Allocation is consistent

15   with National Standards 5 and 7 of the MSA.  Accordingly, Federal Defendants' and

16   Defendant-Intervenors' cross-motions for summary judgment are GRANTED on the Third

17   and Fourth Causes of Action, and Plaintiffs' motion is DENIED.

18        ii.    **National Standard 8 (<u>Fifth Cause of Action</u>).**

19        The parties cross-moved for summary judgment on Plaintiffs' Fifth Cause of

20   Action, which alleges that NMFS violated National Standard 8 by failing to "take into

21   account" the importance of fishery resources to fishing communities by utilizing economic

22   and social data" to provide for the "sustained participation of" and to "minimize adverse

23   economic impacts" on such communities.  16 U.S.C. § 1851(a)(8).  Plaintiffs failed to

24   address Defendants' cross-motion arguments regarding National Standard 8, and Plaintiffs'

25   counsel conceded during oral argument that National Standard 8 was no longer at issue.

26   At any rate, "'[a]bout the best a court can do' when it reviews the NMFS's performance

27   with respect to National Standard No. 8 'is to ask whether the Secretary has examined the

28   impact of, and alternatives to, the plan he ultimately adopts . . . .'"  *Oregon Trollers Ass'n*

26

United States District Court
Northern District of California

1  *v. Gutierrez*, 452 F.3d 1104, 1123 (9th Cir. 2006) (citing *Little Bay Lobster Co. v. Evans*,

2  352 F.3d 462, 470 (1st Cir. 2003)).  It is clear from the administrative record that the

3  Council and NMFS evaluated the difference in quota share allocations among the different

4  alternatives and the resulting impact to processing communities.  *See, e.g.*, AR 3176-80

5  (Final EA noting that Plaintiffs' ports of Westport and Ilwaco, Wasington would benefit

6  from using more recent allocation years, but that those gains come at the expense of other

7  port cities such as Astoria, Washington in Alternative 4, which would lose more initial

8  allocation than Westport would gain); AR 9767-68 (Mar. 2013 Decision Memo stating that

9  "in considering community impacts, NMFS decided to maintain the whiting allocation

10  based on the earlier history (i.e., status quo) in part because it results in a wider geographic

11  distribution of the benefits along the coast").  Federal Defendants examined various

12  allocation alternatives and their impact on the affected fishing communities, consistent

13  with the factors articulated by National Standard 8.   Federal Defendants' and Defendant-

14  Intervenors' cross-motions for summary judgment are GRANTED with respect to the Fifth

15  Cause of Action, and Plaintiffs' motion is DENIED.

16         **iii.**    **National Standard 4 and Objective 14 of the Fishery Management Plan.**

17        Although Plaintiffs discuss violations of National Standard 4 at length in their reply

18  brief, *see* Pls. Reply at 8-9 (Docket No. 56), Plaintiffs did not allege a violation of National

19  Standard 4 in the Complaint and did not move for summary judgment on National

20  Standard 4.  The argument is therefore waived.  *See Zamani v. Carnes*, 491 F.3d 990, 997

21  (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in

22  a reply brief").

23        The Court nonetheless addresses Plaintiffs' argument regarding National Standard 4

24  and Plaintiffs' related argument that the 2013 IFQ Allocation contradicts Objective 14 of

25  the FMP.  These arguments are, in essence, catch-all arguments that challenge the overall

26  fairness and reasonableness of Federal Defendants' 2013 IFQ Allocation.  The Court does

27  not find these arguments persuasive.

28        National Standard 4 provides, in relevant part, that during the allocation of fishing

privileges, the allocation shall be "(A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). The NMFS guidance on National Standard 4, however, recognizes that "[i]nherent in an allocation [of fishing privileges] is the advantaging of one group to the detriment of another . . . . An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups. An allocation need not preserve the status quo in the fishery to qualify as 'fair and equitable,' if a restructuring of fishing privileges would maximize overall benefits." 50 C.F.R. § 600.325(c)(3)(i)(A-B).

Plaintiffs have failed to show that the 2013 IFQ Allocation violates National Standard 4 because the record reflects that NMFS vetted the allocation alternatives and determined that the Original IFQ Allocation maximized overall benefits. *See* AR 3132, 9499-9500, 9746. Thus, the 2013 IFQ Allocation, which retained the Original IFQ Allocation, is consistent with National Standard 4.

Plaintiffs also argue generally that the 2013 IFQ Allocation is not "fair and equitable" because it contradicts FMP Objective 14 by disrupting the current fishing industry. Objective 14 of the FMP provides that "[w]hen considering alternative management measures to resolve an issue, choose the measure that best accomplishes the change with the least disruption of current domestic fishing practices, marketing procedures, and the environment." AR 2086. Plaintiffs contend that the 2013 IFQ Allocation disrupts current domestic fishing practices because it does not take into account post-2003/2004 fishing history for harvesters and processors. Like the National Standards, however, the FMP Objectives do not compel any particular allocation outcome. AR 2084 (FMP stating that the "objectives will be considered and followed as closely as practicable"). Contrary to Plaintiffs' position, the record reflects that NMFS considered and followed Objective 14 in determining the 2013 IFQ Allocation. *See* Final EA, AR 3201 (weighing issue of disruption and determining that lack of IFQ does not prevent

entity from harvesting at recent levels because IFQ is transferable by design); AR 3201-10 (balancing disruption against additional reasons to support 2013 IFQ Allocation); AR 3221 (considering FMP Objective 14 and determining decision to maintain whiting allocations is fair and equitable because maintaining status quo would have least disruption to current 2013 fishery, marketing procedures, and environment).  The Final EA also specifically addressed and rejected Plaintiffs' argument that disruption analysis should judge the disruption from the standpoint of the 2011 fishery as opposed to the 2013 fishery.  The Final EA found that risks of disruption to the current fishery were mitigated because: (1) the January 2004 rulemaking announced the 2003 control date, which put participants on notice about potential disruption thereafter; and (2) the allocation to current owners of permits based on permit history provided opportunities to acquire a share of the initial allocation through acquisition of a limited entry permit, which enabled all participants with an opportunity to plan and adjust for the initial allocation.  AR 3221.  Accordingly, NMFS concluded that maintaining the Original IFQ Allocation in the 2013 IFQ Allocation was "the least disruptive to the majority of current fishery participants."  AR 3221.  Thus, on the record before the Court, Federal Defendants have articulated a reasonable basis for their decisions, and one that considered and is consistent with National Standard 4 and FMP Objective 14.  To the extent the parties sought summary judgment on these issues, the Court GRANTS summary judgment as to Federal Defendants and Defendant-Intervenors, and DENIES summary judgment as to Plaintiffs.

### C.     Federal Defendants Have Not Violated the APA (Sixth Cause of Action).

As discussed above, the Court finds that Federal Defendants in promulgating the 2013 IFQ Allocation, did not violate the MSA; they did not act in an arbitrary or capricious manner, abuse their discretion, or otherwise act in a matter not in accordance with the law.  As such, Plaintiffs have failed to demonstrate a violation of the APA.  Plaintiffs also raise a challenge under the APA in regards to a purported improper political compromise reached in promulgating the 2013 IFQ Allocation.  A rule promulgated under

United States District Court
Northern District of California

the MSA that is a "product of pure political compromise, not reasoned scientific endeavor" violates the MSA and APA. *Midwater Trawlers Coop.*, 282 F.3d at 720. The record, however, does not support Plaintiffs' contention because it indicates that the Federal Defendants weighed the effects of each alternative and vetted how the 2013 IFQ Allocation met the MSA's statutory requirements and national standards, the FMP objectives, and the goals of the trawl rationalization program – in other words, Federal Defendants grounded their decision in reasoned scientific endeavor and articulated their reasons throughout the reconsideration process.

Plaintiffs identify three instances of political activity that purportedly indicate that the 2013 IFQ Allocation is a result of an improper political compromise. But these lone examples, in light of the voluminous record, do not support the inference that the 2013 IFQ Allocation was a "pure political compromise." Pls. Reply at 13-14. The Court does not discern anything improper from the remarks of Washington Department of Fish and Wildlife representative Phil Anderson that the industry undertook "an approach that the majority could support," which resulted in some winners and losers, and accordingly was "maligned as a political compromise," given that he articulated that his overall concern was to have a program in place that survives scrutiny by the NMFS, is consistent with the MSA and other applicable law, and produces a record that would be subject to judicial review. AR 3389-93.

Similarly, the Court is not persuaded that correspondence from a representative of Defendant-Intervenors to NMFS Regional Director William Stelle was itself improper or encouraged a prohibited ex parte contact, AR 17522-526, given that the APA prohibits ex parte contacts only in a formal adjudication, not "informal rulemaking" procedures such as the one at issue. 5 U.S.C. § 553(c) (distinguishing between rulemakings requiring a hearing by statute and "informal" rulemakings); *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1541 n. 15 (9th Cir. 1993) ("The APA does not bar ex parte communications in informal rulemaking proceedings.") Indeed, Plaintiffs' counsel appeared to have engaged in similar communications. *See* AR 15968, 15995.

United States District Court
Northern District of California

1    Lastly, Plaintiffs identify a letter sent to the acting assistant administrator of NOAA

2    from United States Senators from Oregon and Washington supporting the Council's

3    September 2012 recommendation to retain the Original IFQ Allocation.  AR 15927-28.

4    "Before an administrative rulemaking may be overturned on the grounds of Congressional

5    pressure, two conditions must be met. 'First, the content of the pressure upon the Secretary

6    [must be] designed to force him to decide upon factors not made relevant by Congress in

7    the applicable statute . . . . Second, the Secretary's determination must be affected by those

8    extraneous considerations." *Radio Ass'n on Defending Airwave Rights, Inc. v. U.S. Dep't*

9    *of Transp, Fed. Highway Admin.*, 47 F.3d 794, 807 (6th Cir. 1995) (*Sierra Club v. Costle*,

10   657 F.2d 298, 409 (D.C. Cir. 1981).  Here, the cited letter does not appear designed to

11   force NMFS to decide the IFQ allocation on extraneous factors, nor do Plaintiffs identify

12   evidence in the record indicating NMFS's 2013 IFQ Allocation decision was affected by

13   the letter at all.  Indeed, "Americans rightly expect their elected representatives to voice

14   their grievances and preferences concerning the administration of our laws . . . it [is]

15   entirely proper for Congressional representatives vigorously to represent the interests of

16   their constituents before administrative agencies engaged in informal, general policy

17   rulemaking, so long as individual Congressmen do not frustrate the intent of Congress as a

18   whole as expressed in statute, nor undermine applicable rules of procedure."  *Costle*, 657

19   F.2d at 409.

20   Plaintiffs concede that they "do not assert that anything unethical occurred here;"

21   rather, they conclude the letter was "intended as political pressure to achieve a particular

22   administrative outcome."  Pls. Opp. at 14, 14 n.15.  The point of this and the other

23   examples cited by Plaintiffs is that a campaign of political pressure worked in concert with

24   industry pressure, and that purportedly shows the 2013 IFQ Allocation was a result of

25   "pure political compromise."  However, this argument is simply not supported by the

26   record, which shows that NMFS reasonably concluded that it received "appropriate input

27   from the affected industry that was developed as part of the overall transparent and public

28   process that established the catch shares' program."  AR 9563.  NMFS was satisfied that

31

1  there were numerous reasons that supported the Council's recommendation, which were

2  "developed based upon consideration of the best available scientific information," and the

3  factors provided in the MSA, the groundfish FMP, and the goals of the catch share

4  program.  AR 9561.  The Court cannot disagree given the record.

5          The Court therefore finds that Federal Defendants did not violate the MSA or APA.

6  Federal Defendants' and Defendant-Intervenors' cross-motions for summary judgment are

7  GRANTED with respect to the Sixth Cause of Action, and Plaintiffs' motion is DENIED.

8

9  **V.    CONCLUSION**

10         Given the totality of the record, Federal Defendants have considered the relevant

11  factors mandated by the MSA and articulated a rational connection between the facts

12  found and the choice made to retain the Original IFQ Allocation in the 2013 IFQ

13  Allocation.  Thus, they have satisfied their obligations under the MSA and APA.  For the

14  reasons discussed above, Federal Defendants' and Defendant-Intervenors' cross-motions

15  for summary judgment are GRANTED with respect to all causes of action in the

16  Complaint, and Plaintiffs' motion is DENIED.  The Clerk shall enter judgment and close

17  the file.

18

19         **IT IS SO ORDERED.**

20

21

22  Dated:   12/05/13

23                                          THELTON E. HENDERSON, JUDGE
                                            UNITED STATES DISTRICT COURT

United States District Court
Northern District of California

32